CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

August 26, 2025

LAURA A. AUSTIN, CLERK
BY:
    s/A. Beeson
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **RODERICK W. McDOWELL,** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 7:23CV00569 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **CHADWICK DOTSON, DIRECTOR** | ) | Judge James P. Jones |
| **OF THE VIRGINIA DEPARTMENT** | ) | |
| **OF CORRECTIONS,** | ) | |
| | ) | |
| Respondent. | ) | |

*Jennifer L. Givens, THE INNOCENCE PROJECT AT THE UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Petitioner; Aaron J. Campbell, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondent.*

Petitioner Roderick W. McDowell, a Virginia prison inmate, was convicted in 2009 in the Circuit Court of Albemarle County, Virginia, of robbery and first-degree murder and sentenced to 60 years' incarceration. In his counseled habeas petition under 28 U.S.C. § 2254, he seeks relief based on alleged instances of prosecutorial misconduct as well as claims of ineffective assistance of counsel. In response, the Commonwealth[1] moves to dismiss, asserting that many of McDowell's claims are defaulted by not being fully exhausted. McDowel contends that any

---

[1] For convenience, I will refer to both the prosecution in state court as well as the Respondent in this habeas case as the Commonwealth.

default is overcome by his actual innocence.  In addition, as explained in my earlier decision in this case, *McDowell v. Dotson*, No. 7:23CV00569, 2023 WL 2891504 (W.D. Va. June 10, 2024), it is suggested that any default could be overcome by a showing that the state habeas counsel was ineffective.  Because present counsel for McDowell also represented him in his state habeas proceeding, and in accord with *Martinez v. Ryan*, 566 U.S. 1, 14 (2012), I will appoint separate and independent counsel for McDowell to pursue that issue.

For the reasons stated hereafter, I will grant in part and deny in part the Commonwealth's Motion to Dismiss, dismissing certain of the claims, and reserving the remaining claims pending the appointment of separate and independent counsel.

## I.  BACKGROUND.

This case arises from a robbery that occurred around 1:30 a.m. on April 12, 2007, outside the Wood Grill Buffet (Wood Grill) in Charlottesville, Virginia. Sandra Godsey, a manager of the Wood Grill, and her husband William Godsey were exiting the restaurant carrying cash that had been collected the previous day.  As they walked out, two men wearing masks, gloves, and sunglasses and carrying baseball bats accosted them.  Ms. Godsey threw the money she was carrying on the ground.  One of the masked men, whom Ms. Godsey described as "tall and skinny," picked up the money and ran, but the second man, who was shorter and stockier, beat Mr. Godsey over the head with a bat until it broke.  Br. Supp. Mot. Dismiss Ex.

A Pt. I, Tr. 144, ECF No. 13-1.  The second man then attempted to beat Ms. Godsey with the bat until she grabbed a piece of the broken bat and stabbed at him.  Both men fled in a car.  The Commonwealth contended at trial that McDowell was the second assailant who attacked the Godseys and murdered Mr. Godsey.

Police officers arrived at the scene shortly after Ms. Godsey had called 911, and Mr. Godsey was taken to the hospital.  The police were not able to collect any DNA evidence, fingerprints, or shoe impressions from the scene.  *Id.* at 197–99.  The next day Ms. Godsey told the police that she recalled having seen half an inch to an inch of her attacker's cheek.  *Id.* at 168.  She described the skin as being red, which led her to believe that the attacker was not a dark-skinned Black man.  *Id.* at 168, 191.  Mr. Godsey was unconscious, and the police were unable to interview him.  He passed away in the hospital because of his injuries.  *Id.* at 210.

McDowell was indicted by a grand jury in Albemarle County for robbery and murder.  On May 29, 2009, after a three-day jury trial, McDowell was convicted of both crimes.  On July 29, 2009, McDowell received a sentence of 60 years' imprisonment.  He appealed, arguing that the trial judge had erred in denying his request for a cautionary instruction regarding jailhouse informants.  He also contended that the trial judge had erred in failing to strike the testimony of jailhouse informants who had testified against him and that the evidence had been insufficient to support the convictions because it was based solely on the informants' testimony.

Br. Supp. Mot. Dismiss Ex. C, Order & Briefs, ECF No. 13-4.  The Court of Appeals of Virginia denied the appeal for appeal on May 30, 2010.  McDowell filed a second petition for appeal in the Court of Appeals of Virginia, which was denied on July 1, 2010.  He then sought an appeal to the Supreme Court of Virginia, which was refused on December 6, 2010, ending McDowell's direct appeal process.  Br. Supp. Mot. Dismiss Ex. D, Supreme Court Order & Briefs, ECF No. 13-5.

On December 6, 2011, McDowell filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Albemarle County.  He alleged that the Commonwealth had failed to disclose exculpatory evidence and permitted perjurious testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), and that he had received ineffective assistance of counsel.  Br. Supp. Mot. Dismiss Ex. E, Order 5, ECF No. 13-6.  On November 13, 2013, McDowell moved to amend his petition to add a new *Brady* claim alleging that the Commonwealth had withheld exculpatory evidence regarding a trial witness, Alvin Rhodes.  On April 2, 2015, the state court denied all the original claims in McDowell's application for habeas relief but granted his motion to amend the petition.  *Id.* at 16.  The court found no *Brady* or *Napue* violations and that McDowell did not receive ineffective assistance of counsel.  *Id.*  The Commonwealth moved to dismiss the remaining claims.  Because the case remained pending for more than three years without any order or proceeding, it was dismissed for failure to prosecute

on April 1, 2020, pursuant to Va. Code § 8.01-335(B).  Br. Supp. Mot. Dismiss Ex.

F, ECF No. 13-7.  McDowell sought to reinstate the case, which motion was granted

and the habeas case was reopened on June 18, 2020.  McDowell was permitted to

review and copy the Commonwealth's file and he filed a second motion to amend

his petition to add a new *Brady* claim alleging that the Commonwealth had failed to

disclose exculpatory evidence.

On September 19, 2022, the state trial court heard oral argument on

McDowell's claim alleging that the Commonwealth had withheld impeaching

evidence about Rhodes.  Br. Supp. Mot. Dismiss Ex. G, Sept. 2022 Order, ECF No.

13-8.  The court granted the Commonwealth's motion to dismiss and denied

McDowell's motion to amend on September 29, 2022.  In granting the motion to

dismiss, the court held that the evidence of Rhodes's work as an informant in the

City of Charlottesville was not suppressed by the prosecution, either willfully or

inadvertently.  *Id.*  The court also found that McDowell had not been reasonably

diligent in asserting his amended claims since he had waited over three years to file,

and that the Commonwealth would be prejudiced by such a delay.  *Id.*  Lastly, the

court noted that certain evidence that McDowell had raised in his second amended

petition, specifically a 2008 memorandum from the prosecutor and post-trial emails

between the prosecutor and an assistant United States attorney, could not be

considered *Brady* material.  *Id.*  McDowell filed a motion for reconsideration on

October 17, 2022. He asked the state court to reconsider its dismissal of certain claims on the basis that statements made by the prosecutor in his 2008 memorandum were contradicted by his 2012 affidavit. The court never ruled on the motion, and McDowell petitioned for appeal to the Supreme Court of Virginia. On June 5, 2023, the petition for appeal was refused. Br. Supp. Mot. Dismiss Ex. H, June 2023 Order, ECF No. 13-9.

McDowell filed the present petition in this Court on August 31, 2023. He raises the following claims for relief:

I.     The Commonwealth suppressed exculpatory evidence regarding, and presented false testimony from, jailhouse informant Calvin Miller;

II.     The Commonwealth knowingly presented false testimony from jailhouse information Antone Harris;

III.     The Commonwealth suppressed exculpatory evidence regarding, and presented false testimony from, jailhouse informants Chris Karten, Alvin Rhodes, and Brian Turner;

IV.     The Commonwealth withheld favorable impeachment evidence regarding Rhodes and allowed Rhodes to testify falsely without correcting the record;

V.     Trial counsel unreasonably failed to investigate and present evidence of McDowell's alibi;

-6-

VI.    Trial counsel unreasonably failed to investigate and present evidence that Antone Harris fabricated his testimony;

VII.   Defense counsel failed to investigate and present evidence of the jailhouse informants' criminal histories;

VIII.  Defense counsel failed to investigate and present evidence that the actual perpetrators of this robbery and murder were Catrell Harris and Julian Taliaferro;

IX.    Defense counsel failed to review Miller's court file;

X.     The Commonwealth violated *Brady v. Maryland* when it failed to disclose its interview with Larry Breckenridge;

XI.    The Commonwealth violated *Brady v. Maryland* when it failed to disclose its Catrell Harris interviews and Use Immunity Agreement;

XII.   The Commonwealth violated *Brady v. Maryland* when it failed to disclose documents related to Karten's sentence reduction;

XIII.  The Commonwealth violated *Brady v. Maryland* when it failed to disclose the 2008 memorandum from Prosecutor Elliott Casey to Commonwealth's Attorney Denise Lunsford.

In its Motion to Dismiss, the Commonwealth argues that only claims I, II, and V are exhausted and reviewable in federal habeas corpus, but that these claims fail on the merits. It contends that the remaining ten claims must be dismissed because

they were not directly presented to the Supreme Court of Virginia in McDowell's habeas appeal and under Virginia's statute of limitations and bar on successive habeas petitions could not be raised now.   The Commonwealth also disputes McDowell's actual innocence and argues that he cannot meet the standard for such a claim as established in *Schlup v. Delo*,  513 U.S. 298, 326 (1995).

McDowell admits that claims I, II, and V are procedurally barred but contends that this Court is permitted to review of all the claims because he is actually innocent of the crimes of conviction.

## II. Discussion.

### A. Standard of Review.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts federal habeas relief afforded to state prisoners.   Federal habeas relief on a claim that was adjudicated on the merits in a state court is barred unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).   "Generally, a federal court may not consider claims that a petitioner failed to raise at the time and in the manner required under state law."   *Teleguz v. Zook*, 806 F.3d 803, 807 (4th Cir. 2015) (citation omitted).   However, "a petitioner

otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). "[A] claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* (internal quotation marks omitted).

## B. Actual Innocence Gateway.

McDowell argues that he is actually innocent of the crimes of which he was convicted. For an actual innocence claim to be credible, the habeas petitioner must present "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* The *Schlup* standard is demanding. *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013). "The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial

unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* (internal quotation marks and citation omitted).

In assessing the adequacy of McDowell's showing, I am "not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327. The court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation modified). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

I must first address whether McDowell has presented "new" evidence that meets the standard explicated in *Schlup*. In its motion to dismiss, the Commonwealth argues that McDowell has not presented new and reliable evidence such that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. The Commonwealth avers that McDowell has not put forward any new evidence that would implicate another suspect or any recantation by the incarcerated informants who testified against him. In response, McDowell asserts that he has met the *Schlup* standard by presenting evidence of the benefits received by incarcerated informants. He argues that "new reliable evidence" under the *Schlup*

standard should mean "newly presented" rather than "newly discovered." Pet'r's Reply Opp'n Mot. Dismiss 6, ECF No. 17.

While there may be a split in the circuits, *Clevland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012), the Fourth Circuit has indicated that it finds the *Schlup* "standard [to be] broad, encompassing both 'evidence that became available only after trial' and evidence 'unavailable or excluded at trial.'" *Wolfe v. Dotson*, 144 F.4th 218, 234 (4th Cir. 2025) (quoting *Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999)).

Moreover, nothing in *Schlup* indicates that a petitioner may only put forward newly discovered evidence. The requirement is that the petitioner submit "new reliable evidence . . . that was not presented at trial." 513 U.S. at 324. The Court further explains the obligation of the habeas court to make its determination "in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been *wrongly excluded*," suggesting that evidence must be newly presented. *Id.* at 328 (emphasis added). As stated earlier, the *Schlup* standard is already demanding. I decline to read in an additional threshold requirement for habeas petitioners without explicit guidance from the Fourth Circuit or the Supreme Court. Therefore, McDowell is only required to support his claims with newly presented evidence, not newly discovered.

McDowell offers five categories of evidence in support of his *Schlup* gateway innocence claim, which I address in turn.  First, McDowell asserts that the prosecution did not disclose the fact that jailhouse witnesses were highly incentivized to provide testimony against him.  He presents a 2008 memo from Elliott Casey, the Assistant Commonwealth's Attorney who led McDowell's prosecution, to Denise Lunsford, the Commonwealth's Attorney, in which Casey details what five witnesses were prepared to testify and what they expected to receive in return for their testimony.  Pet. Ex. I, Casey Mem., ECF No. 1-10.  McDowell also submits a 2012 affidavit where Casey states that he made no promises to three of the witnesses and that he "was not aware of any records of their efforts to seek sentence reductions."  *Id.* at Ex. H, Casey Aff., ECF No. 1-9.  In response, the Commonwealth argues McDowell has not met the *Schlup* standard and that Casey did not perjure himself in his memo.

While the memo and affidavit constitute new and reliable evidence, I find that they do not offer any compelling evidence of McDowell's innocence.  At most, the documents provide additional support for arguments regarding the informants' motivations that were put forward by the defense at trial.  The memo states that informant Reggie Parker expected more money for his testimony, and he testified at trial that he received a thousand dollars in exchange for information he provided to the police.  Casey Mem., ECF No. 1-10; Tr. 240, ECF No. 13-1.  Parker also stated

at trial that it was a possibility he would receive more money.  Tr. 240, ECF No. 13-1.  The memo additionally lists Alvin Rhodes as expecting consideration at his federal sentencing.  Casey Mem., ECF No. 1-10.  At trial, Rhodes said that he *hoped* to receive something in exchange for his testimony or get leniency.  Tr. 328, ECF No. 13-1.  Rhodes testified that he had not been promised anything, which is consistent with Assistant United States Attorney Nancy Healey's affidavit.  Pet. Ex. D, Healey Aff., ECF No. 1-5.  Healey stated that while she did not recall any specific conversations with Rhodes, her practice was to tell all cooperators that she could not make specific agreements, promises, or deals regarding the sentence she would recommend.  *Id.*

The memo stated that Calvin Miller, another informant, expected consideration at sentencing in a case in the City of Charlottesville.  Casey Mem., ECF No. 1-10.  At trial, Miller stated that he was not told what he was going to get in return for testifying.  Br. Supp. Mot. Dismiss Ex. A Pt. II, Tr. 364, ECF No. 13-2.  McDowell also presents a March 2009 letter written by Casey to Judge Edward Hogshire of the Circuit Court for the City of Charlottesville, who was hearing Miller's cocaine distribution case.  Pet. Ex. E, Casey Letter to Judge Hogshire, ECF No. 1-6.  The letter stated that Miller "came forward" and "provided crucial information about Mr. McDowell's activities before and after the homicide" to the grand jury that indicted him.  *Id.*  While the letter did not request that Judge Hogshire

take any action, it stated that Miller's "testimony at trial will be significant."  *Id.*
McDowell argues that the letter was "part of a coordinated effort to assist Miller in
getting a sentencing continuance for his drug convictions."  Pet. 29, ECF No. 1.  But
while the letter might suggest that the Commonwealth was requesting leniency for
Miller, it does not rise to the *Schlup* standard.  Again, it only provides support for
the argument that defense counsel made at trial.

As to Chris Karten, Brian Turner, and Antone Harris, they also do not meet
the *Schlup* standard.  All of them gave jailhouse informant testimony and were
mentioned in the 2008 memorandum written by Casey as hoping for or expecting
consideration at sentencing or a sentence reduction.  But Karten[2] and Turner testified
that they were hoping for the same at the trial.  Tr. 385–86, ECF No. 13-2 (Karten
was "hoping to get something" and he "want[ed] to get out of jail"); *id.* at 420
(Turner was "hoping to get something in exchange").  And while Casey's memo did
not mention Harris, Harris testified that no one had given him anything for testifying
and he did not expect anything for testifying.  Tr. 314, ECF No. 13-1.

Second, McDowell argues that jailhouse informant testimony is notoriously
unreliable.  He reports that jailhouse informant testimony helped secure wrongful
convictions in nearly one fifth of the first 367 DNA-based exonerations in the United
States.  He also lists reforms enacted in seven states that require additional

---

[2] Also spelled "Carton."  Va. Ct. App. Pet. 16 n.8, ECF No. 13-4.

disclosures and tracking for informant testimony.  In McDowell's case, the trial judge refused a proffered instruction cautioning that the testimony of witnesses hoping for consideration at their sentencings for their assistance "should be received by [the jury] with great care and caution."  Order & Briefs 3, ECF No. 13-4.

But these facts do not raise the case to the level required by *Schlup*.  The jury knew that the witnesses were jailhouse informants, and they heard testimony that the witnesses either hoped to receive consideration in sentencing or received a monetary reward for their testimony.  Ultimately, McDowell's argument goes to the credibility of informant testimony generally but does not show that a reasonable juror in this case would not have resolved the credibility issues of these specific jailhouse informants against McDowell.

Third, McDowell asserts that his ineffective trial counsel had access to a strong alibi — records of calls made from McDowell's cell phone around the time of the crime — but failed to present it to the jury.  McDowell's live-in girlfriend, Amanda Brock, testified that she could not remember the night of the robbery but that McDowell "was always there before I went to sleep."  Tr. 481, ECF No. 13-2. McDowell asserts that Brock testified that "normally, Mr. McDowell would be asleep in bed with her before 1:00 a.m., and that she had no reason to believe that on the night of the Wood Grill murder, he was anywhere other than asleep in bed with her. (Tr. at 481:3–13.)"  Pet. 8, ECF No. 1.  The cited page of the transcript, however,

does not include Brock stating or agreeing that they were usually in bed together by 1:00 a.m. That section of the transcript reads:

> Q: Ms. Brock, are you aware, let's just take the last couple of weeks in April. Are you aware of anytime during the month of April when Mr. McDowell wasn't with you when you went to bed?
>
> A: I can't recall that, sir.
>
> THE COURT: I beg your pardon?
>
> A: I can't recall that, like, that was a long time ago.
>
> Q: Okay.
>
> A: He was always with me, like, he was always there before I went to sleep.

Tr. 481:3–13, ECF No. 13-2.

McDowell argues that it would have bolstered Brock's testimony if his counsel had presented the records of calls made from his phone on the night of the robbery. He contends that it is apparent that Brock was using McDowell's phone to make calls, and he was thus likely with her, rather than engaging in the crimes at issue. As counsel argues, "the data strongly suggests that Mr. McDowell spent a mundane night at home with his girlfriend, placing inquiries about jobs and allowing his girlfriend to use his phone to talk with her sister."

The records show that between 11:51 p.m. and 12:07 a.m., three calls were placed by McDowell's phone to the University of Virginia Credit Union, where Brock was an account holder and McDowell was not. Between 1:12 a.m. and 2:04

a.m., three calls were placed by McDowell's phone to Brock's sister's phone. The only calls that night that Brock claimed in an affidavit were placed by McDowell were made at 11:46 p.m. Pet. Ex. X, Brock Aff. ¶ 8, ECF No. 1-24; *id.* at Ex. W, Call Records.[3] McDowell states that Brock has sworn he would have had no reason to speak to her sister at that time. He claims Brock could have testified that her phone was broken at the time and McDowell never left his phone with her when he was out. He argues this is "objective evidence that Mr. McDowell was with Brock at the time of the crime." Pet. 20, ECF No. 1.

But the call records do not place either of them at their home at the time of the crime, or McDowell with Brock. The jury clearly discounted Brock's testimony that she had no reason to think McDowell was not with her the night of the robbery. And if, as McDowell claims, Brock had testified that there was no reason for her to think that they were not asleep by the time of the Wood Grill robbery, which happened at about 1:30 a.m., then the call records discredit that testimony. Brock made her final call to her credit union at 1:12 a.m. and called her sister at 2:03 a.m., which calls into question any claim that she had been asleep at the time of the robbery. These call records do not rise to the *Schlup* standard, even if McDowell's

---

[3] While the hardcopy Petition and exhibits submitted to the court contain an Exhibit W that consists of the call records, the electronic case filing docket does not contain an Exhibit W. As a result, a docket number was not assigned to it.

counsel had introduced them and elicited testimony from Brock that McDowell never parted with his cellphone.

I address the fourth and fifth categories together.  McDowell argues that he did not fit the description of the assailant provided by Ms. Godsey.  Ms. Godsey testified that her attacker's skin was red, and that the assailant reminded her of the son of one of the Wood Grill's employees, who was Hispanic and had lighter skin color than McDowell.  Tr. 165, ECF No. 13-1.  Ms. Godsey also noted that the getaway car looked like a Dodge Neon.  *Id.* at 174.  McDowell states that he has never been connected with a Dodge Neon.  Lastly, McDowell argues that two local men, J.T. Taliaferro and Catrell Harris, better fit Ms. Godsey's description of the assailants and that the police never seriously pursued these individuals as suspects. He states that, during an interview with a detective, Harris's father said Harris had admitted to having some involvement in the robbery.  Pet. Ex. LL, Woycik Investigative Report, ECF No. 1-38.

Ms. Godsey's testimony regarding the skin color of the second assailant and the appearance of the getaway car is not new.  As the Commonwealth notes, Ms. Godsey testified at trial to these facts.  At trial, McDowell's defense counsel emphasized the discrepancy between McDowell's skin color and what Ms. Godsey observed during the attack.  Tr. 604–05, 637, ECF No. 13-2.  Evidence pointing to two other suspects is also not new.  *Id*. at 457–58, 637.  McDowell's trial counsel

urged the jury to view Taliaferro and Harris as the real perpetrators and acquit McDowell. *Id.* at 637. He stated, "Catrell Harris is the shorter guy, the lighter-skinned [B]lack male, certainly fits the description of somebody who might have red cheeks much more so than Rod McDowell." *Id.* McDowell argues that these categories of evidence serve to establish his innocence as a whole and demonstrate that it is more likely that not that no rational trier of fact would have found him guilty. However, the *Schlup* standard requires a showing of new evidence not presented at trial. While I may consider this evidence in assessing the adequacy of McDowell's actual innocence claim, it does not satisfy the requirements of *Schlup*.

Because McDowell has not shown with "new reliable evidence . . . not presented at trial" that "no reasonable juror would have found [him] guilty beyond a reasonable doubt," he does not satisfy the actual innocence gateway. *Schlup*, 513 U.S. at 324, 327.

## C. Claims for Relief.

McDowell brings thirteen claims for relief. The Respondent argues that only the first three are exhausted and reviewable at the federal habeas level, and that McDowell is barred from raising the other ten because of Virginia's statute of limitations for habeas petitions and its bar on successive habeas petitions. McDowell argues that I may still consider procedurally defaulted claims once he establishes that his state habeas counsel was ineffective under *Martinez*. He asks

that I appoint separate and independent counsel to investigate those claims.  For the following reasons, I find that McDowell is not entitled to relief on any non-defaulted claim.  Because his actual innocence defense to default is without merit, I will permit development of arguments under *Martinez*, as I explained in my previous ruling. *McDowell v. Dotson*, 2024 WL 2891504, at *1.

The three exhausted and reviewable claims McDowell brings are *Brady* and *Napue* claims.  A *Brady* violation involves three components.  First, it involves favorable evidence, which includes both impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Second, the favorable evidence must have been suppressed by the prosecution.  However, "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial."  *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985).  Third, the suppressed, favorable evidence must be material, which is the case if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id.*

In *Napue v. Illinois*, the Supreme Court reaffirmed the principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction."  360 U.S. at 269.  A *Napue* claim requires a showing of both (1) the

-20-

falsity and materiality of the testimony and (2) the prosecutor's knowledge of the falsity. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002).

McDowell's first reviewable claim, Claim I, is that the Commonwealth suppressed exculpatory evidence regarding Miller and presented false testimony from him. He argues this violated *Brady* and *Napue*. On the *Brady* aspect of his argument, McDowell claims that the Commonwealth did not disclose its evidence that Miller received a substantial benefit for his cooperation against McDowell. This substantial benefit was a sentencing continuance for his drug convictions. But McDowell has not shown that this evidence, a letter by Casey to Judge Hogshire, was actually suppressed. Casey's affidavit states that the letter was added to the prosecution's file and available for review before trial. Casey Aff. 2, ECF No. 1-9. Trial counsel's affidavit states that he reviewed the file twice and did not see the letter, but concedes that "[e]ither it wasn't there, or I didn't notice it." Pet. Ex. R, Snook Aff. ¶ 20, ECF No. 1-19. Furthermore, McDowell cannot show that the evidence was material. The letter did not speak of or request a sentence reduction. Instead, it informed Judge Hogshire of Miller's cooperation. The jury heard Miller testify that he was cooperating, Tr. 342, ECF No. 13-1, and had previously testified for the government in two other murder trials. Tr. 347–48, ECF Nos. 13-2. He also testified that he hoped for leniency. As a result, there is not a "reasonable

probability" that this letter would have led to a different result. *Bagley*, 473 U.S. at 682. The state court's ruling was not unreasonable under § 2254(d).

The *Napue* portion of this claim also fails. McDowell claims the Commonwealth permitted Miller to testify falsely that he had not received a benefit for his testimony and also that the continuance of his sentencing date was unrelated to his cooperation for McDowell's trial. Miller testified as follows:

> Q: Mr. Miller, when are you expecting to be sentenced?
>
> A: Next month on the 23rd.
>
> Q: Okay, and it's been continued a number of times until your various cooperations are completed?
>
> A: No.
>
> Q: I beg your pardon?
>
> A: No.
>
> Q: It hasn't been continued?
>
> A: It got continued this time. It wasn't ---it ain't had nothing to do with this.
>
> Q: Okay. Thank you.

Tr. 365, ECF No. 13-2.[4] Even assuming without deciding that Miller's testimony was false, McDowell is unable to demonstrate that it was material. As the Commonwealth argues, Miller was asked both on direct and cross-examination

---

[4] This page of the electronic record is missing but appears in the hard copy of the record. The Clerk shall add it to the electronic docket of this case.

about his cooperation.   Miller confirmed that he had pled guilty on a cocaine

distribution charge and was awaiting sentencing for it and had previous felony

convictions on his record.  Tr. 341, ECF No. 13-1.  He told Casey that "in exchange

for any information" he "hope[d]" to receive "[s]ome leniency towards" sentencing.

*Id.* at 342.  And he testified that he was hoping to "get the felony taken care of" as a

result of his cooperation across McDowell's trial and the two other murder cases.

Tr. 355, ECF No. 13-2.  The thoroughness of the questioning shows that the jury

was well aware of Miller's incentives to testify and that he hoped for substantial

benefits as a result.  As a result, even if the jury had also heard that Casey sent a

letter to Judge Hogshire and that Miller received a continuance following the receipt

of that letter, McDowell has not shown that the jury's judgment was likely to have

been affected.  Again, the state court's adjudication was not unreasonable.

McDowell's second reviewable claim, Claim II, is that Casey violated *Napue*

by presenting false testimony from Harris.  When Harris first took the stand, he said

that he did not overhear McDowell incriminating himself to other inmates or speak

with him about the Wood Grill crimes.  He also denied telling law enforcement

anything different.   After three witnesses testified, the Commonwealth recalled

Harris, and he testified that McDowell had implicitly confessed.  McDowell's trial

counsel asked him about his decision to testify again:

> Q: So what happened in the last half-hour? Who did you talk to in the last half-hour that made you decide to come out and talk about this?
>
> A: I ain't talked to nobody. I mean, I just --- I was nervous the first time I came out here.

Tr. 380, ECF No. 13-2. But Casey's affidavit states that, after Harris testified the first time, Casey received a message that Harris wanted to speak with him. They met in the holding cells and Harris said he wanted to testify again because he had panicked the first time. Casey Aff. ¶ 6, ECF No. 1-9. McDowell claims this shows that Harris was lying when he said he "ain't talked to nobody," and that Casey knew it was false. Tr. 380, ECF No. 13-2. But the question trial counsel asked was, "Who did you talk to in the last half-hour *that made you decide to come out and talk about this*?" *Id.* (emphasis added). Casey's affidavit reflects that he did not encourage Harris to testify or direct him to do so. As the state habeas court ruled, "[o]bviously, Harris had not gotten from the holding cell to the courtroom without telling someone that he wished to take the witness stand again." Order 5, ECF No. 13-6. Similarly, the affidavit submitted by a representative of the University of Virginia Innocence Project regarding another inmate housed with McDowell and Harris shows that Casey and Harris interacted after he first testified. But it does not show that Casey told Harris to retake the stand or that Harris was lying. Casey's affidavit is not inconsistent with Harris's testimony, and McDowell has therefore not shown that Harris's testimony was false.

McDowell's third reviewable claim, Claim V, is an ineffective assistance of counsel claim. When reviewing claims that counsel provided ineffective assistance at trial or on appeal, a federal court must apply a highly deferential standard. A petitioner must show (1) that counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In the context of an exhausted § 2254 habeas claim, review of counsel's performance is "doubly deferential," because the *Strickland* standard overlaps with the deferential standard under 28 U.S.C. § 2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (citation omitted).

To establish the element of deficient performance, a petitioner must demonstrate that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategic decisions. *Id*. at 689. Under § 2254(d), the performance question becomes "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" of objective reasonableness. *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

In Claim V McDowell argues that his trial counsel was ineffective for not establishing McDowell's alibi with his cell phone's call records.  As explained in addressing this same issue for McDowell's actual innocence claim, the call records do not "confirm Brock's testimony that McDowell was home with her at the time of the crime." Pet. 44, ECF No. 1.  They do not place McDowell in a particular location at the time of the crimes.  No calls were placed at or immediately around 1:30 a.m., which was about when the crime took place.  Tr. 183, ECF No. 13-1 (testimony from the responding police officer describing his dispatch at 1:31 a.m. and his arrival at the Wood Grill at 1:34 a.m.).  The calls closest in time occurred at 1:12 a.m. and then at 2:04 a.m., although the records do not appear to record the length of those calls.  For the same reasons that the call records do not support an actual innocence argument, the call records and Brock's potential testimony that McDowell never left his cell phone at home do not support a claim that trial counsel's performance fell below an objective standard of reasonableness.

McDowell makes ten other claims for relief.  However, the parties disagree over whether one of those claims, Claim III, is exhausted and reviewable.  Br. Supp. Mot. Dismiss 14 n.6, ECF No. 13 (arguing that McDowell did not appeal the respective state habeas claim on the merits).  Even assuming that the claim is reviewable, it does not justify relief.  Claim III is that the Commonwealth suppressed exculpatory evidence regarding Karten, Rhodes, and Turner, and presented false

testimony from them.  This is a similar claim as McDowell's argument that he is actually innocent because the prosecution's witnesses falsely testified that they did not expect anything in exchange for their testimony.

The first part of Claim III asserts that the Commonwealth coordinated the three witnesses' sentence reductions in exchange for their testimony but withheld evidence about this from McDowell's trial counsel.  The relevant evidence is Casey's 2008 memo, although McDowell also points to the "timing of the three witnesses' sentence reductions — all within one month of McDowell's trial" as "creat[ing] a reasonable presumption that the Commonwealth coordinated the witnesses' sentence reductions."  Pet. 37, ECF No. 1.  The 2008 memo does not meet the *Brady* materiality requirements.  There is no reasonable probability that the outcome would have been different if the jury knew about it, because the three witnesses' testimony aligned with what the memo reflected about their hopes and expectations for post-conviction consideration.  Karten, Rhodes, and Turner testified that they were hoping to get something in exchange for their testimony.  Tr. 385–86, ECF No. 13-2 (Karten was "hoping to get something" and he "want[ed] to get out of jail"); Tr. 328, ECF No. 13-1 (Rhodes "hope[d] that [he] may get something in exchange or [he] might get some leniency in the future on [his] sentence"); Tr. 420, ECF No. 13-2 (Turner was "hoping to get something in exchange").  This is reflected in the memo.  Casey Mem. 1–2, ECF No. 1-10 (Karten "is hoping for post-conviction

consideration," Rhodes "expects consideration at his Federal Sentencing," and Turner "expects a sentence reduction"). For the same reasons, the Commonwealth did not elicit false testimony from the defendants. The state court's adjudication of the claim, to the extent that it is reviewable, was not factually or legally unreasonable. As a result, Claim III, even if it is reviewable at the federal habeas level, does not justify relief.

The remaining claims are defaulted and not reviewable at this point because they were either never considered on the merits at the state level or were not appealed after being denied. Because McDowell has not satisfied the actual innocence standard, I will appoint separate and independent counsel to investigate the effectiveness of McDowell's state habeas counsel.

### III.    CONCLUSION.

For the reasons stated, the Motion to Dismiss, ECF No. 12, is GRANTED in part and DENIED in part. It is GRANTED as to Claims I, II, III, and V, and DENIED as to Claims IV and VI through XIII. The Court will appoint separate and independent counsel to represent the petitioner McDowell as to his claim that his state habeas counsel was ineffective by causing these remaining nine claims for relief to be defaulted.

It is so **ORDERED**.

ENTER:   August 26, 2025

/s/  JAMES P. JONES
Senior United States District Judge